IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| (1) ELIZABETH R. PINKAS,              ) <br> ) <br> **Plaintiff,**                        ) <br> ) <br> v.                                                ) <br> ) <br> (1) LIBERTY LIFE ASSURANCE ) <br> COMPANY OF BOSTON,         ) <br> ) <br> **Defendant.**                      ) | Case No.  4:17-cv-493 <br><br> Attorney Lien Claimed |

## COMPLAINT

Plaintiff, Elizabeth R. Pinkas, for her cause of action against Defendant, Liberty Life Assurance Company of Boston ("Liberty Life"), alleges and states as follows:

### I.     Jurisdiction and Venue

1.     Plaintiff brings this action pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to recover long-term disability ("LTD") benefits due under an employee benefit plan, and to recover costs and attorney's fees as provided by ERISA.

2.      This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.  Under 29 U.S.C. § 1132(f), this Court has jurisdiction without regard to the amount in controversy or the citizenship of the parties.

3.     Venue is properly in this district pursuant to 29 U.S.C. § 1132(e)(2) and pursuant to 29 U.S.C. § 11391(b), in that a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this district.

## II.     Parties and Plan

4. Plaintiff is a fifty-eight (58) year-old female. She resides in the City of St. Louis, St. Louis County, State of Missouri and in this judicial district.

5. At all relevant times, Plaintiff was employed by Wells Fargo & Company ("Wells Fargo"). She worked as a Systems QA Analyst 3 ("Systems Analyst") for Wells Fargo in St. Louis, Missouri.

6. During the term of Plaintiff's employment, Wells Fargo provided short term and long term disability insurance coverage to its eligible employees, including Plaintiff, through welfare benefit plans: the Wells Fargo & Company Short-Term Disability Plan ("STD Plan") and the Wells Fargo & Company Long-Term Disability Plan ("LTD Plan").

7. At all relevant times, Plaintiff was eligible to participate in the Wells Fargo STD and LTD Plans, did participate in the Plans, and was a participant in the Plans within the meaning of 29 U.S.C. § 1002(7).

8. The STD Plan is self-insured by Wells Fargo and Liberty Life is the named claim administrator. Accordingly, when Liberty Life approved a STD claim for payment the funds to pay the claim came from Wells Fargo.

9. The LTD Plan is an "insurer administration" type plan pursuant to a group insurance contract between Wells Fargo and Liberty Life. The applicable Group Disability Income Policy is GF3-850-289424-01, and the governing jurisdiction applicable to the policy is Minnesota. Pursuant to the terms of the LTD Plan and policy, LTD claims are administered by Liberty Life and benefits under the LTD Plan are paid

by it.  Benefit determinations with respect to Plaintiff's claim under the LTD Plan were at all relevant times made by Liberty Life.

10. At all times relevant, Liberty Life was and is a Plan fiduciary within the meaning of 29 U.S.C. § 1002(21)(A).

### III.     Allegations Applicable to All Claims

11. Plaintiff began working for Wells Fargo on February 14, 2000.  She last worked on May 14, 2015.

12. As a Systems Analyst, Plaintiff was paid $33.82 per hour or $70,346 annually.

13. As a Systems Analyst, Plaintiff worked 40 to 50 hours per week.  She was required to constantly sit from 6-8+ hours per day, occasionally walk from 30 minutes to 3 hours per day, and on a seldom basis lift or carry no greater than 10 pounds.  Among other non-physical work requirements, the job required Plaintiff to create, prepare and implement systems quality assurance reviews for numerous applications; consult with users, providing advice and direction; and perform more complex analysis of business requirements and system specifications.   Plaintiff's job did require face-to-face customer contact, and by telephone or email.

14. As a consequence of debilitating spinal disorders and related pain and restrictions, Plaintiff could not perform the duties of her job after May 14, 2015.

15. On May 15, 2015, based on preoperative diagnoses of post laminectomy syndrome, lumbar spine, and right sciatica secondary to a foraminal disk herniation of right L5-S1, Plaintiff underwent a revision lumbar laminectomy at the L5-S1 and fusion.

16. Liberty Life approved Plaintiff's request to take leave pursuant to the Family & Medical Leave Act ("FMLA") due to her incapacitating serious health condition, and it further approved Plaintiff's claim for STD benefits for the entirety of the STD period beginning May 22, 2015 through November 12, 2015.

17. On October 5, 2015, Liberty Life notified Plaintiff that it was commencing its review of her eligibility/entitlement to LTD benefits.

18. By letter dated October 6, 2015, Liberty Life asked Plaintiff to complete and return a battery of forms, including an Activities Questionnaire. In the Questionnaire, Plaintiff reported she was able to sit 1-2 hours, stand 1 hour, and walk 1 hour per day. She explained her inability to engage in gainful employment as follows:

> There is pain shooting from my lower back into my buttocks, to my right thigh, down into the top of my foot & two left toes on my right foot. I can't stand or sit up for longer than an hour without pain getting worse & then having to take pain pill, muscle relaxer & lay to get pain under some control.

19. On October 26, 2015, Liberty Life approved Plaintiff's claim for LTD benefits beginning November 13, 2015 as a consequence of information and records it received from Plaintiff's treating physician and spine surgeon.

20. On November 3, 2015, Liberty Life sent Plaintiff a letter offering her social security disability services because it anticipated her debilitating impairments would persist and render her entitled to social security disability income benefits. Liberty Life subsequently referred Plaintiff to a law firm with a focused practice on social security disability claims.

21. On November 11, 2015, Plaintiff underwent another surgery to remove a

-4-

screw from the hardware related to a back surgery at the L4-5 level done in 2011.

22. She continued to be followed by her spine surgeon and did not do well. In February 2016, Plaintiff's treating spine surgeon, Dr. Lukasz J. Curylo, saw Plaintiff and his impressions were (1) juxtafusional spondylolisthesis L3-4 with bilateral issues with suspected right-sighted symptoms either trochanteric bursitis versus L3-4 instability related; and (2) possible L5-S1 related issues regarding left-sided pain with intermittent paraethesias down into the lesser toes.

23. In March 2016, Dr. Curylo completed a Liberty Life restrictions form and said, "Patient is unable to work at this time due to not able to stand, sit, walk for more than 5 minutes without resting."

24. On April 4, 2016, Plaintiff followed-up with Dr. Curylo. Dr. Curylo reviewed her MRI from September 2015. He noted her complaints of continued pain down both legs, and that she got only temporary relief from an epidural steroid injection. Dr. Curylo's noted impression was "patient with an L4-5 fusion and post-laminectomy syndrome with spondylolistheses juxtafusional at the L3-4 level." More epidural steroid injections were planned. Upon review of Plaintiff's old MRI, Dr. Curylo specifically noted the moderate stenosis at the L3-4 level and said "[p]erhaps this is getting worse."

25. Plaintiff saw Dr. Daniel Sohn on April 15, 2016, and he administered the planned epidural steroid injection at the L3-4 level. The noted clinical assessments were spinal stenosis of the lumbar region; lumbago with sciatica, right side; and lumbago with sciatica, left side.

26. An MRI of the lumbar spine done on May 13, 2016, confirmed Plaintiff's

multilevel degenerative disease not significantly unchanged since September 2015.

27. On May 17, 2016, Plaintiff saw Dr. Curylo in follow-up. On examination, he noted Plaintiff's pain with lumbar flexion and extension. His clinical impressions were juxtafusional spondylolisthesis at the L3-4 level above a healed fusion at L4-5, and leg pain that occasionally radiates down to the left foot. Dr. Curylo discussed with Plaintiff undergoing a revision lumbar surgery with lumbar laminectomy revision L3-4, and an L3-4-5 fusion after first removing the old instrumentation.

28. As reflected in its claim diary note dated July 2, 2016, Liberty Life decided to send Plaintiff's claim our for a "PM&R review,"[1] and in furtherance of the same, it sent Plaintiff's file to a third-party vendor, MCMC, on or about July 7, 2016.

29. The case report prepared for Liberty Life regarding Plaintiff's claim was provided by Dr. Ashot S. Kotcharian, who is noted in the report as being board certified in physical medicine & rehabilitation. In his report, Dr. Kotcharian acknowledged that the medical evidence supports diagnoses of spondylolisthesis of lumbar region, post-laminectomy syndrome, spinal stenosis of lumbar region, lumbago with sciatica right side, lumbago with sciatica left side, trochanteric bursitis of the right hip, and shoulder impingement syndrome.

30. Dr. Kotcharian, who never examined or clinically observed Plaintiff, went on to say that she "would have the capacity for full-time work" with the following restrictions and limitations:

> The claimant can sit for eight hours per day. However, she should be

---

[1] PM&R refers to Physical Medicine and Rehabilitation.

restricted to sitting no longer than two hours continuously due to post-laminectomy syndrome pain. Standing and walking can total a combined six hours per day, but not for longer than 30 minutes at a time due to post-laminectomy syndrome pain.

31. Liberty Life paid MCMC $570 for the report, which appears to reflect payment for 2 hours of effort on the part of MCMC and/or Dr. Kotcharian.

32. Based on Dr. Kotcharian's report, by letter dated July 27, 2016, Liberty Life notified Plaintiff her LTD benefits were not payable beyond July 27, 2016.

33. Liberty Life's reliance on Dr. Kotcharian's brief review and conclusory assertions about Plaintiff's work ability is unreasonable and reflects an unprincipled review because Dr. Kotcharian is not a neurosurgeon or an orthopedic spine surgeon.

34. By letter dated August 22, 2016, Plaintiff appealed the denial of her LTD claim and submitted additional information and records.  The submitted information, along with the existing information and records in the claim file, made clear that Plaintiff's various diagnoses and symptoms rendered her disabled within the meaning of the Plan.

35. Included among the new information was an FMLA certification completed by Plaintiff's treating physician, Dr. Selwyn Picker.  By form dated August 18, 2016, Dr. Picker endorsed that Plaintiff was unable to work from July 28, 2016 to November 7, 2016 because of right lower extremity pain, left lower extremity neuralgia, bilateral sciatica still recurring from L5-S1.  He also noted that she was "holding off" from possible surgery at the L3-4 level.

36. By letter dated September 8, 2016, Liberty Life notified Plaintiff that her

appeal was denied.

37. Liberty Life's review of Plaintiff's appeal was conducted by a Liberty Life-nurse.  The nurse merely reiterated the review of Dr. Kotcharian.  Liberty Life's reliance on the opinion of its nurse over the opinions of Plaintiff's treating physicians is unreasonable and reflects an unprincipled review because the nurse was patently unqualified to assess Plaintiff's serious spinal impairment and related chronic pain.

38. In reaching its adverse claim decision and during the course of its claim handling process leading to the same, Liberty Life failed to apply the terms of the applicable policy to Plaintiff's LTD claim, cherry-picked record information which might lend support to a claim denial while de-emphasizing or disregarding record information supportive of her claim, failed to consider the material, non-exertional duties of Plaintiff's occupation, and unreasonably relied on file reviews done by an unqualified Liberty Life nurse and a physician consultant who never observed or examined Plaintiff.

39. Plaintiff has exhausted her administrative remedies under the Plan.

### IV.   Statement of Claims

#### First Claim

#### ERISA – Improper Denial of Benefits

40. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 39 of this Complaint as though set forth at length herein and further alleges:

41. At all relevant times the terms of the Plan required payment of LTD benefits to Plaintiff due to her debilitating impairments and consequential inability to

perform the material and substantial duties of her own occupation.

42. The failure of Liberty Life to pay LTD benefits to Plaintiff due to her debilitating impairments is contrary to the terms of the Plan and is wrong and/or arbitrary and capricious.

43. Plaintiff seeks a declaration from this Court that she is entitled to the LTD benefits due her under the terms of the Plan, and an Order that all future disability benefits and related other employee and/or Plan benefits should be provided and maintained pursuant to the terms of the Plan.

44. By reason of Liberty Life's erroneous, wrongful, and/or arbitrary and capricious claim decision, Plaintiff has been forced to retain an attorney to secure disability benefits due her under the terms of the Plan for which Plaintiff has and will incur attorney fees and costs.

45. Plaintiff is entitled to recover the reasonable attorney fees and costs of this action pursuant to 29 U.S.C. § 1132(g)(1).

**WHEREFORE**, Plaintiff, Elizabeth R. Pinkas, demands judgment against Defendant, Liberty Life Assurance Company of Boston, as follows:

(1)  for a declaration that Defendant improperly denied payment of LTD benefits to Plaintiff, and that Plaintiff is entitled to receive the amount of benefits due under the terms of the Plan that have not been paid, together with prejudgment and post-judgment interest thereon;

(2)  for a declaration that all future LTD benefits be paid pursuant to the terms of the Plan;

(3)  for a declaration that all related other employee benefits due Plaintiff as a consequence of her continuous total disability under the Plan be reinstated and/or paid according to the terms of the Plan;

(4)  for the costs of this action and Plaintiff's attorney fees, pursuant to 29 U.S.C. §1132(g); and

(5)  for such other and further relief as may be deemed just and proper by the Court.

        **Respectfully submitted,**

        **SHOOK & JOHNSON, PLLC**

**By:**    **s/ Jonathan E. Shook**
        **Jonathan E. Shook, MO Bar #68898**
        **7733 Forsyth Blvd., Suite 1100**
        **St. Louis, MO 63105**
        **(314) 296-6095 –** *telephone*
        **(314) 296-6001 -** *facsimile*
        **jshook@shookjohnson.com**

        **ATTORNEY FOR PLAINTIFF**